MADHUSUDAN KATTI,    )
            )
    Plaintiff,    )
            )
v.            )
            )
N.C. STATE UNIVERSITY, JEAN )   **COMPLAINT**
GOODWIN, in her individual and )  **(JURY TRIAL DEMANDED)**
official capacity, STITH "TOM" )
GOWER, in his individual and official )
capacity, KEN ZAGACKI, in his )
individual and official capacity, )
WARWICK A. ARDEN, in his individual )
and official capacity, and MYRON )
FLOYD, in his individual and official )
capacity.       )
            )
    Defendants.   )

COMES NOW the Plaintiff Madhusudan Katti (Katti or Plaintiff) and complaining of Defendants N.C. State University, Jean Goodwin, (Goodwin) in her individual and official capacity, Tom Gower (Gower), in his individual and official capacity, Ken Zagacki, in his individual and official capacity, Warwick A. Arden (Arden), in his individual and official capacity, and Myron Floyd (Floyd), in his individual and official capacity, and shows the Court the following:

## INTRODUCTION

1. This is an action for damages, including back pay and attorney's fees, under 42 U.S.C. § 1981 against all of the defendants for intentional discrimination against

Plaintiff based on his ancestry and ethnic characteristics, and race in denial of promotion/tenure.

2. This is also an action damages, including back pay and attorney's fees, under 42 U.S.C. § 1983 against all of the individual defendants in their individual capacities for intentional discrimination against Plaintiff based on his ancestry and ethnic characteristics, and race in the denial of tenure/promotion.

## JURISDICTION, PARTIES AND VENUE

3. Jurisdiction of this court arises under 28 U.S.C.A. § 1331 based on plaintiff's claims under the 42 U.S.C.A. §§ 1981 and 1983 for violation of his federal civil rights.

4. Venue is proper in this court pursuant to 28 U.S.C.A. § 1391(b) because all of the parties are located or have their principal place of business in Wake County, North Carolina.

5. Defendant NCSU is a "state" as defined pursuant to 29 U.S.C.A. § 705(34) and 42 U.S.C.A. § 1983.

6. Defendants are all residents in the district or have their principal place of business in this district.

## INTRODUCTION

7. On April 28, 2020, Dr. Katti received a letter from Defendant Arden, copied to Defendant Floyd, Dean of the College of Natural Resources, and Defendant Gower, Head of the Department of Forestry and Environmental Resources, informing him that he had been denied tenure and notifying him that his current

appointment with Defendant NCSU would end effective May 15, 2021. **Exhibit DE1-1.**

8.  Dr. Katti appealed his denial of tenure and proceeded through the administrative appeals process provided by Defendant NCSU. As a result, his non reappointment was reversed and he was offered the opportunity to re-apply for tenure, which he did, and was granted in a letter dated April 17, 2023.

9.  Dr. Katti is Indian, being from the country of India, is of Indian descent, his ethnicity is Indian; he is considered a member of the Asian race by the U.S. Census.

10. His discriminatory denial of tenure in 2020 resulted in his having to expend a significant amount of money on attorney's fees, lost income, and it caused him mental and emotional distress, all of which he seeks to recover from Defendants.

## FACTUAL BACKGROUND

11. Dr. Katti began working for NCSU on August 16, 2016, after giving up a tenured position as an Associate Professor in California State University, Fresno, after serving 12 years in the Dept of Biology there because the position in the Leadership in Public Science cluster at NCSU felt like a dream job.

12. Dr. Katti was willing to take an appointment as Associate Professor without tenure only because he was told there was **no culture or practice** of offering appointments with tenure in the department or college.

## **2017 Calendar Year**

13. Dr. Katti's first Annual Review (for the 2016 calendar year) was based on a Statement of Mutual Expectations which was finalized on April 15, 2017. Dr. Katti's Annual Accomplishment Review in person meeting occurred, and after that in person meeting, on June 15, 2017, Dr. Tom Gower, Department Head, wrote Dr. Katti, stating the following:

> Your great efforts to re-build and/or move your research program should yield numerous publications and future extramural funding. I am confident you research program will flourish and you will quickly become one of FER's top grant writers. Thank you for participating in the first annual? graduate student recruiting event.
>
> I look forward to working with you to identify teaching needs. I am pleased you have agreed to teach Urban Wildlife Management and a Principles of Public Science. I am excited to learn about the study abroad program you are developing.
>
> Your efforts in service are appropriate as an untenured Associate Professor. I will continue to avoid assigning you to department and college committees until you are granted tenure.

14. At the time of his appointment, Dr. Katti was informed that he had a choice for the evaluation of his future tenure application: he could have either traditional departmental review by Departmental Voting Faculty (DVF) or a review by an Interdisciplinary Retention, Promotion, and Tenure Committee (IRPTC).

15. Based on advice he received from Dr. Gower and also from Cluster Lead Dr. Ken Zagacki, Head of the NCSU Communication Department, Dr. Katti selected the interdisciplinary committee and to his knowledge is only the second person in his college to have selected this option.

16. The committee members were selected and communicated via a document entitled "Plan for Review Form: Joint and Interdisciplinary Faculty" which listed them and which was signed on March 11, 2018, by Dr. Katti, Dr. Gower and Dr. Zagacki, joint department heads, and Dean Mary Watzin, Dr. Katti's home college dean.

17. Significantly, the list included Dr. Jean Goodwin, a member of the Public Science cluster, and professor in the Department of Communication.

18. During 2017, Dr. Katti continued his membership in professional associations, served on a search committee for two faculty position for the Chancellor's Faculty Excellence Program, engaged in significant off campus professional service activities, taught two courses as required by his teaching load:  NR 595 in the Spring and FW 403 in the Fall, continued his mentoring of a post-doc student at a different institution, as well as continued to assist as chair or co-chair for a committee for a Ph.D. student and 2 Masters students at NCSU, and a committee members for one other PhD student and 3 others Masters students at NCSU.

19. In addition, he published one peer-reviewed article and had one in progress, published two other non-refereed articles, and presented five conference papers. He successfully obtained one grant, applied unsuccessfully for three others, and continued work on a grant obtained in 2016, ending in 2019. He served on multiple committees for multiple centers, consortia, and institutes involving

interdisciplinary/ multidisciplinary activities across and within departments and universities.

20. He co-produced a radio show for KFCF public radio in Fresno, CA and episodes of his accompanying podcast, developed a new citizen science project "Triangle Bird Count" mirrored after the Fresno Bird Count, published an essay in his recurring column called *Reconciliation Ecology*, in the publication *Current Conservation* and another essay in an online forum with significant readership, and served as a peer reviewer on 5 manuscripts for various journals.

## 2018 Calendar Year

21. Dr. Katti's in person annual review meeting with Dr. Gower and Dr. Zagicki, for the calendar year 2017 occurred in April 2018. The review meeting went well and it was noted that Dr. Katti had received very positive peer evaluations with regard to his teaching for the previous fall semester. Dr. Gower expressed concern over some low teaching evaluation scores from students. Significantly, there was no mention of any students working on the Doris Duke Conservation Scholars program during the review meeting (because the Duke Scholars was summer 2018 program).

22. There was discussion of postponing additional work on creating a study abroad program due to Dr. Gower's concern that Dr. Katti needed to focus on producing peer-reviewed publications and obtaining extramural funding. Because it was included as an item on his Statement of Faculty Responsibilities (SFR, which replaced the previous SME) Dr. Katti had invested a fair bit of time to develop a

summer study abroad course which the NCSU Study Abroad office was very enthusiastic about. However, after Dr. Gower included this statement in his annual review meeting summary, and discouraged him for further developing it, Dr. Katti put it back on the shelf, despite his passion for it and despite the fact that it would allow him to being his international experience and expertise in urban ecology to teaching in a unique way.

23. However, after the in person review annual review meeting for Dr. Katti's performance during the calendar year 2017, in July 2018, Dr. Gower wrote Dr. Katti a letter purporting to summarize his 2017 review meeting, but which included the following:

> Your research program is slowly getting established. You published one peer-reviewed journal article this year and have one in press. I encourage you to focus on getting more peer reviewed manuscripts published in the coming year and worry less about non-peer reviewed and conference papers. You currently have one PhD student and I believe you have another student starting fall 2018. ***It is unfortunate that the Doris Duke undergraduate students left***. The other area that warrants attention is securing extramural funding. I know you have submitted several nice NSF grants so hopefully the revised proposals will be successful. ***You taught two courses in 2017/18***. The average student evaluation score for NR 595 and FW 403 were 4.72 and 3.43, based on the standard 13 questions. ***For comparison, the average student evaluation score for all FER faculty was 4.39***. As you, Ken and I discussed at a recent meeting, it seems prudent to postpone the study abroad course until you have secured some extramural grants and produced some high-quality peer reviewed journal articles. Your efforts in service are appropriate as an untenured Associate Professor. I will continue to avoid assigning you to department and college committees until you are granted tenure. In closing, I want to thank you for helping building a great department. Your efforts are greatly appreciated.

24. As stated above, Dr. Gower included a reference to the Doris Duke scholars program in the annual review letter even though he never discussed the program with Dr. Katti either at the annual meeting, or at anytime, much less ever reach out to Dr. Katti to understand what actually occurred.

25. This lack of communication regarding the incident was ultimately very damaging to Dr. Katti as Dr. Gower included information in his department head recommendation which referenced the incident and include "false" information about it and Dr. Katti's role in the departure of the students, to wit:

> Dr. Katti generously agreed to mentor several undergraduate students on their research projects that are a required component of the esteemed undergraduate Doris Duke Conservation Scholars (DDCS) program that is housed in the Department of Forestry and Environmental Resources and administered by a FER faculty. ***The DDCS students complained he sometimes did not show up for meetings at his office and were given little guidance. The students' frustration grew to the extent that they called the Director of the Doris Duke Scholarship program at the University of Florida and she instructed them to come to Florida, which they did. This was a huge embarrassment for the NC State DDSC program and I was unaware of the issue until it was too late. We almost lost the program.***

26. Not only did Gower never discuss with Dr. Katti **any concerns whatsoever** regard the Duke Scholars program during his annual review or before or after it, in Dr. Katti's annual review he used the mildest of references to mention it: "It is **unfortunate** that the Doris Duke undergraduate students left."

27. Dr. Gower devoted ten times the words to the "incident" in his "unenthusiastic recommendation" for tenure letter than he did to the sentence (inappropriately included) in the 2017 academic year review summary, which in no way put Dr.

Katti on notice that Dr. Gower considered it a "huge embarrassment" or that he thought that NCSU "almost lost the program."

28. As noted, the Doris Duke students did not even begin the program, much less leave until well after the annual review meeting attended by Dr. Katti, Dr. Gower, and Dr. Zagacki in March 2018, thus the matter was not appropriately included in the review of his 2017 calendar year performance.

29. And had Dr. Gower bothered to discuss the matter with Dr. Katti at the time it occurred in 2018, or at Dr. Katti's 2018 annual review meeting, he would have learned that the version of events he provided in his "damned by faint praise" letter purporting to be a "recommendation" for Dr. Katti was completely false.

30. In fact, as Dr. Zakiya Leggett—the campus program director, also in the Dept of Forestry & Environmental Resources—confirmed, Dr. Katti was assigned three students to mentor as part of the national Doris Duke Conservation Scholars Program during summer 2018.

31. Dr. Katti met with Dr. Leggett and one of his graduate students on May 9, 2018 to develop a plan of research and study for the students, with an emphasis on mentoring them to develop independent research projects leading up to presentations at the end of the summer, and potentially in conferences during the following academic year. All three then had a video conference call to meet with the three female students (two African American and one White) on May 25, 2018, and orient them about the plan of action.

32. Everyone was made aware that Dr. Katti would be away for an UrBioNet research meeting at the University of Columbia, MO during their first week in the program (starting on June 11), and the grad student would also be out of the country working in an Earthwatch program.

33. Dr. Katti worked with the graduate student to develop a GIS tutorial for the students to study online and prepare for research during that first week, when they would also have some orientation and other activities on campus supervised by Dr. Leggett.

34. Upon returning to campus from their travels, Dr. Katti and the graduate student met with all three Doris Duke Scholars on June 18, 2018, and discussed potential project ideas from each of them, to provide appropriate resources and guidance. Over the following week, Dr. Katti and his grad student met with all three students in a group and individually to help start independent research projects, identify resources and additional collaborations, and set up websites.

35. On June 29, 2018, Dr. Katti received a voicemail followed by an email from Dr. Leggett requesting a meeting about the students. In the meeting, Dr. Leggett informed Dr. Katti that one of the students (the White female) had made some complaint to the National Director of the Doris Duke program, who had then made the decision to move all three students to Florida immediately that weekend. The nature of the complaint was not made clear, and the students left without further communication. Dr. Leggett indicated that she too felt

blindsided by the decision from the National Director to reassign the students to a project in Florida.

36. Dr. Katti shared all record of communications between himself and the three students with Dr. Leggett to try and determine if there had been some miscommunication. Dr. Leggett informed him that there was a history of problems between the National Director and NC State over some previous years, and that may have played some role in the abrupt unilateral decision by the Director to move the students.

37. Dr. Katti offered to meet with Dr. Gower along with Dr. Leggett to address any concerns, but this was deemed unnecessary by Dr. Gower. It should be noted that the White student who had allegedly complained about Dr. Katti subsequently took a class with him in Fall 2019 and did very well with no complaints. One of the African American students also worked with Dr. Katti in her capacity as a student club leader in helping prepare a grant proposal.

38. In retrospect, Dr. Gower's annual review summaries of his meetings with Dr. Katti followed a pattern whereby he delayed writing annual review letters until months after the actual review meeting occurred and then inserted comments into the letters that had not been discussed (and in the case of the Doris Duke scholars had not even occurred) at the time of the annual review meeting.

39. Dr. Katti later learned that in sharp contrast, other individuals who were not of his race and who were preparing a summary of their annual accomplishments had been strictly instructed that the review is intended to be a review of

performance during the previous calendar year and to that end, not to include any publications or grants dated after December 31 of the previous year.

40. Yet in Dr. Gower's letters for the 2018 review (involving the Doris Duke scholars) and 2019 review (discussed below and involving the Public Science class cancellation which occurred in January 2019, which was also mentioned by the IRPTC report as a significant concern), Dr. Gower included items based on Dr. Katti's work during the respective current year, again without discussing either matter with Dr. Katti at the in person annual review meeting.

41. After his review in April 2018 but prior to the departure of the Doris Duke Scholars in May 2018, Dr. Katti was copied on an email to a mentoring committee that unbeknownst to him had been created in July 2016.

42. Prior to May 2018, no one had reached out to mentor him, despite Dr. Katti having asked Dr. Gower repeatedly during 2017 and 2018 to find him some mentors to help with the challenges of transitioning from a primarily undergraduate teaching institution to a major research (R01) university.

43. In an email dated May 21, 2018, **almost 22 months** after Dr. Katti's hire date and only one year before his tenure application would be submitted, Dr. Gower finally reached out to the mentoring committee and asked them to schedule a meeting with Dr. Katti and noted Dr. Katti's selection of the interdisciplinary committee for his tenure review. Dr. Katti met with the committee members on June 7, 2018.

44. In late October 2018, Dr. Katti and Dr. Caren Cooper, a colleague in both the Chancellor's Faculty Excellence Program in Leadership in Public Science (known as the Public Science cluster) and in the Department of Forestry and Environmental Resources, had a series of emails concerning what Dr. Cooper initially described as a "difficult situation."

45. The difficult situation involved a grad student who had expressed some feelings about her first semester after transferring from an HBCU to NCSU. Dr. Cooper and Dr. Katti had a series of conversations about the situation, and it eventually resolved very favorably. In fact, the graduate student at issue continued to thrive in Dr. Katti's lab, successfully defended her Masters' thesis on May 7, 2020, went on to co-organize an unprecedent national public science event, the first Black Birders' Week during the first week of June 2020 to national acclaim, and is in the currently a Ph.D. student in the department.

46. Dr. Goodwin and Dr. Gower became aware of some, but incomplete details, regarding the situation and did not attempt to ascertain the entire story and they declined to follow up and learn that the situation resolved favorably. However, apparently Dr. Gower's either knowing or willfully not knowing the details of the situation affected his, and possibly, Dr. Goodwin's understanding of the actual situation, and enhanced their ill will towards and negative opinion of Dr. Katti, which was undeserved. Again, as with the situation involving the Doris Duke scholars, Dr. Gower did not reach out to Dr. Katti or the graduate

student at any point to discuss what actually happened and how the situation resolved.

## 2019 Calendar Year

47.  In January 2019, a graduate level seminar class in "Principles of Public Science" scheduled to be team taught and led by Dr. Katti had low enrollment. After receiving advice and recommendations from Dr. Gower, Department Head, and Public Science cluster heads, Dr. Zagacki and Dr. Rob Dunn, Dr. Katti followed the Public Science cluster's advice that it was not worth the cluster's effort to teach three students. Dr. Katti also offered to teach an additional course in the fall of 2019 as had been indicated was a common response to the cancellation of a class.

48.  On March 21, 2019, Dr. Katti had his annual review meeting with Dr. Zagacki and Dr. Gower. During the meeting, Dr. Katti learned that a colleague, Dr. Jean Goodwin, a professor in the Department of Communication, Dr. Zagacki's department, had called Dr. Gower and "yelled at him" for allowing Dr. Katti to cancel the team taught Public Science class. Dr. Katti was alarmed when he learned this because Dr. Goodwin was serving on his tenure review committee, and he knew his tenure application was due to be submitted and considered in just a few months. When he expressed alarm, Dr. Zagacki and Dr. Gower told him to address the cancellation in his tenure review documents.

49.  Although it was unknown to Dr. Katti at the time of the meeting, Goodwin had in fact written and sent a memo complaining about Dr. Katti to Gower and

Zagacki before the March 21, 2019, annual review meeting. Not only did Dr. Gower and Dr. Zagacki not disclose the existence of the written complaint, but they also subsequently denied knowledge of its existence during the OIED investigation in Fall 2020 following Dr. Katti's appeal.

50. The Goodwin memo was strong evidence of her bias against Dr. Katti and its suppression by Gower and Zagacki indicates their complicity in allowing her biased attacks to taint his tenure review.

51. The memo alone should have been grounds for Dr. Gower and Dr. Zagacki to remove Dr. Goodwin from Dr. Katti's committee, but they did the opposite by not only leaving her on the committee, they also encouraged Dr. Katti to not make any efforts to have her removed, and by not disclosing the existence of the memo which Dr. Katti only learned about during the OIED investigation.

52. After the revelation of this information about Dr. Goodwin, Dr. Katti immediately reached out to her via email in an attempt to address Dr. Goodwin's concerns about the cancellation of the team-taught Public Science graduate seminar. Dr. Katti indicated that he valued Dr. Goodwin's counsel, was aware that she was "disappointed" in him for various reasons, that he wanted to "clear the air" and ensure that he had not "burned bridges." Dr. Goodwin responded stating that the "cancellation of this year's intro course was for me a great disappointment" and that she would be willing to meet with him.

53. At the meeting on March 29, 2019, instead of having a professional exchange between two colleagues, Dr. Goodwin essentially told Dr. Katti:

- she was not prepared to accept him in the Public Science cluster as a trusted colleague;

- she would not take him up on his offer to make up for the failings that she saw in him;

- she viewed him as a constant disappointment and incapable of producing anything; and

- dismissed his National Science Foundation RAPID grant as something she did not expect to lead to anything meaningful because Dr. Katti was incapable/incompetent.

54. After this hostile exchange, Dr. Katti emailed Dr. Gower alerting him to the negative substance of the meeting with Dr. Goodwin and expressed concern that she would not be an impartial member of his interdisciplinary committee for his tenure review and requesting to discuss the matter further.

55. Dr. Katti and Dr. Gower met the first week of April and Dr. Katti met with Dr. Zagacki on April 9, 2019. Both Dr. Zagacki and Dr. Gower reassured Dr. Katti that the presence of one or even two negative votes on the committee should not affect the outcome of a twelve-member committee and that it would look bad for him to change the composition of the committee at such a late date. Dr. Katti decided to again take their advice and did not press the issue of having Dr. Goodwin removed from the tenure review committee.

56. During this same time period, Dr. Cooper had an in-person conversation with Dr. Goodwin because it was apparently common knowledge that Dr. Goodwin had a personal dislike for Dr. Katti. During this meeting Dr. Cooper attempted to persuade Dr. Cooper that if she were asked to be on Dr. Katti's tenure review committee that she ought to decline and not interfere with the process.

57. On April 5, 2019, Dr. Goodwin disclosed to Dr. Cooper that she (Dr. Goodwin) had been selected to be on Dr. Katti's tenure review committee.  On April 8, 2019, Dr. Cooper  sent a slack message to Dr. Goodwin stating the following:

> And I am hoping you will consider shifting your perspective on Madhu. Look at him this way: He is a slow professor (like opposite of fast food). He really knows ecology and evolution (way better than me), and he is thoughtful about other disciplines, and so he takes longer to bake his work. He may not measure up with traditional academic metrics but we know those metrics are not ideal. He may ultimately have more impact than someone who works to meet the metrics.

58. Dr. Katti was not aware at this time that in fact Dr. Goodwin should have recused herself under the University Policy REG 05.20.05 which provides the following:

> 1.5 DVF or CRPTC members have the responsibility to recuse themselves from voting if there is an actual or appearance of a personal or professional conflict of interest.  For example, if a DVF or CRPTC member has been the subject of a formal grievance **or other less formal complaint** by the candidate or vice versa that would create the appearance of a conflict of interest, the DVF or CRPTC member **must recuse** himself or herself.  The DVF or CRPTC member must inform the Department Head of the recusal but is not required to explain the basis of the recusal.

59. Clearly, Dr. Goodwin was aware of the appearance of a conflict of interest to such an extent that one of her Public Science cluster colleagues (Dr. Cooper) asked her to decline to serve and recuse herself from participating not once, but twice.

60. But even if Dr. Goodwin shirked her responsibility imposed by this policy, Dr. Gower and Dr. Zagacki were aware of the animosity of Dr. Goodwin towards Dr. Katti because they discussed it at his annual review in March and then again in

April when Dr. Katti contacted them both and expressed his concern about the level and intensity of the animosity held by Dr. Goodwin towards him.

61. They took no action either to ensure that Dr. Katti was provided a fair review of his tenure application. In addition, there is no indication that Dr. Gower or Dr. Zagacki or the Deans to whom they reported and who appointed the interdisciplinary committee either consulted with Dr. Katti or the Provost as required by Section 1.72 regarding the propriety of the appointment of Dr. Goodwin to the IRPTC given her significant animosity towards Dr. Katti.

62. Under Section 1.72, the Dean is tasked with creating "an interdisciplinary review committee made up of . . . appropriate faculty member; interdisciplinary review committees shall be appointed in consultation with the candidate, the Head of the home department and other faculty familiar with the faculty member's interdisciplinary area and approved by the Provost."

63. Dr. Katti did not receive a post Annual Review letter from Dr. Gower until July, after he had submitted his dossier for tenure review on June 5, 2019. On the positive side, the annual review letter from Dr. Gower noted that he had been awarded a National Science Foundation RAPID grant and congratulated him for the same. Dr. Gower also noted that Dr. Katti had two Ph.D. students and one MGIST student.

64. However, and notably, Dr. Gower made no mention of any issues with mentoring any students, graduate or otherwise.

65. Again, his efforts at service were deemed appropriate and Dr. Gower thanked him as usual for helping to build a great department and indicated appreciation for his efforts.

66. However, Dr. Gower informed Dr. Katti that his Teaching and Mentoring effort for 2018 were regarded as not meeting expectations because 1) he only taught one course and 2) his student evaluation scores for that class was 3.6/5.0.

67. In fact, Dr. Katti did teach two classes in 2018, and this statement by Dr. Gower did not accurately reflect Dr. Katti's performance in 2018. Like his previous annual review summary letter from Dr. Gower, Dr. Gower once again included as a criticism an event which occurred in the subsequent calendar year and an issue which he did not discuss with Dr. Katti at his in-person annual review meeting.

68. And again, Dr. Gower made no mention of the graduate student mentoring issue that he would raise in his department head "recommendation' submitted during the tenure process. Dr. Katti was shocked and disappointed to see that the cancellation of the team-taught Public Science class, which he had been advised to do by Dr. Gower because teaching a small class would hurt his tenure efforts, had been held against him as half of the justification for the "not meeting expectations" rating.

69. As for his class evaluation score, Dr. Gower noted that Dr. Katti's score of 3.6 put him in the lowest 5% of the FER faculty.

70. This note and the fact that his teaching evaluation score (3.6/5.0) was considered a negative were surprising and confusing because:

- Dr. Katti had never been told that he was expected to produce a certain numerical rating for his teaching;

- Dr. Katti was unaware that the FER department faculty were evaluated within the Department to each other and had clearly extremely high evaluations; and

- Dr. Katti's score had actually increased from 3.5/5.0 to 3.6/5.0 for the same class he had taught the previous year with no indication whatsoever that the score was unacceptably low.

71. Fortunately, Dr. Katti prepared and included an analysis of the class evaluation ratings in his tenure dossier submitted on June 5, 2019, even though he had not yet seen his annual review letter from Dr. Gower dated July 4, 2019.

72. Subsequent to the submission of his tenure dossier, Dr. Katti's six external reviewer letters of evaluation were received by the end of August 2019.

73. In addition, as chair, Dr. Gower provided a "recommendation" for consideration. Dr. Gower included information about Dr. Katti's not teaching the Spring 2019 class, even though he had indicated to Dr. Katti that he would assign him an extra class in the fall so that he would meet his teaching effort.

74. Dr. Gower's department head "recommendation" also focused on his efforts at NCSU. Dr. Gower's tenure "recommendation" stated the following:

> Dr. Katti's mentoring of students has not been without incidents. One of Dr. Katti's graduate students has struggled because of his lack of guidance and availability. The student confided in two colleagues for

advice and each colleague met with me privately and expressed concern
of Dr. Katti's lack of availability. The issue was eventually resolved to
the satisfaction of the graduate student.

75. As with the issue involving the Doris Duke scholars' program, Dr. Gower never even mentioned this matter to Dr. Katti, much less inquired about the facts of the matter or the validity of the concern of the colleagues who approached him about Dr. Katti's "alleged unavailability" either at the time or prior to including a reference to it in his "recommendation."

76. The IRPTC met to consider Dr. Katti's suitability for tenure in September 2019.

77. On October 8, 2019, Dr. Gower notified Dr. Katti that the committee had declined to recommend him for tenure due to a 6 votes opposing/5 votes in favor of decision.

78. Despite Dr. Katti's understanding that there would be twelve votes on review, Dr. Gower informed him that Ken Zagacki was deemed not eligible to vote.

79. Notably, the IRPTC report did not take a clear position on whether Dr. Katti should be granted or denied tenure, instead noting that the "committee had mixed opinions about whether Dr. Katti met the Standards for tenure," that "these mixed opinions were reflected in a 6-5 recommendation" and concluded by "[r]ecognizing that this was a close vote and that others are involved in the final decision…"

80. The close vote and apparently the "mixed opinions" resulted in the abdication of the responsibility to make a firm decision on whether Dr. Katti's accomplishments were of sufficient quantity and quality to entitle him to tenure.

81. On October 9, 2019, the IRPTC and department head letters were released to Dr. Katti via the online portal and Dr. Katti was given five days to submit a response, which he did in a timely manner.

82. Dr. Katti noted in his response that the deadline for his tenure application did not allow him to include projects which would counter the assertion that he was on downward trend in scholarship since his arrival at NCSU, the multiple proposals in progress, an invitation from the *Princeton University Press* to submit a full book proposal related to his collaboration with a high regarded South African scholar.

83. The subsequent denial of tenure and the arduous grievance process that eventually overturned that denial forced Dr. Katti to shelve the book project as well as the related collaboration further affecting his scholarly work.

84. In his rebuttal, Dr. Katti noted that the discounting of the value of "open-access and data publications" ignored the fact that both are "increasingly significant in ecology."

85. The IRPTC report was unclear as to the period of time over which Dr. Katti was being evaluated, referring sometimes to his time at NCSU and sometimes referring to his entire career.

86. It should be noted that prior to Dr. Katti's coming to NCSU Dr. Katti was a tenured Associate Professor at California State University at Fresno (CSU-Fresno) since 2011 and left that position to come to NCSU as a nontenured

professor only because he was told by Dr. Gower during negotiations that neither the department nor the college offered tenured appointments.

87. After Dr. Katti agreed to come to NCSU as untenured, he learned that the department did in fact hire at least three individuals with tenure (and at least one other cluster faculty had been hired in the department with tenure a few years earlier), although to his knowledge none of them are persons of Dr. Katti's race or ethnicity.

### The IRPTC Report

88. The Committee's Report was a deeply flawed review of Dr. Katti's accomplishments.

### <u>Scholarship</u>

89. Dr. Katti's "Scholarship" evaluation (or as labelled in his Statement of Faculty Responsibilities ("SFR"), his "Discovery of Knowledge through Discipline-Guided Inquiry") was prolific. Despite the abundance of activity presented in his dossier, the IRPTC report provided a lukewarm review with positives often tainted by what can only be described as picayune comments.

90. For example, while noting that Dr. Katti brought ""interdisciplinary scholars together," the report included a note of "concern about him not carrying forward some initiatives he starts in a timely fashion that allows sufficient attention to quality." However, the only specific example cited to support this concern was Dr. Katti's characterization of his podcast as "monthly" but in actuality limited to four episodes since his coming to NCSU. In fact, his dossier described his

podcasts at NCSU as "regular," not "monthly." The "monthly" references were with regard to the frequency of his podcasts at CSU-Fresno, where they originated.

91. In fact, Dr. Katti continued to assist in producing the monthly radio show on 88.1FM in Fresno, and the delays in posting the recordings as podcasts was due to technical issues at the station and the need for a new hosting space, which Dr. Katti set up in 2018.

92. The four episodes mentioned in the IRPTC letter were ones produced in Raleigh, and Dr. Katti's efforts to produce more locally were thwarted by scheduling difficulties with his co-host Dr. Katie Mack (also then a Public Science Cluster member) and inconsistent access to and technical support in a professional recording studio (unlike the radio station in Fresno).

93. Of the 23 statements in the scholarship section of the assessment, seven were negatives which concerned (in addition to the above concern) the following:

- the unfunded nature of, and small participant involvement in, the Triangle Bird Count;

- the lack of podcasts since 2016; and

- and the limited quantity and public impact of his four published essays since coming to NCSU.

94. As Dr. Katti had explained, the value of the Triangle Bird Count was precisely the fact that it was a relatively low-cost Citizen Science project which engaged

the community and built citizen participation, like the highly successful project Dr. Katti established in Fresno, the Fresno Bird Count.

95. All of these negatives concerned only his activities since Dr. Katti came to NCSU and ignored his publication record, grants, and scholarly public engagement over his career.

96. No criticism was provided of his pre-NCSU efforts, and the criticisms were the only ones that the IRPTC could come up with to justify the denial of tenure.

97. This was in stark contrast to the external reviews where most reviewers noted that Dr. Katti was a highly respected and impactful public scientist who has been successful in weaving together research, teaching, and public science in highly effective ways not captured by standard academic metrics used in tenure reviews. Thus, clearly Dr. Katti had the international respect and stature required for a tenured faculty member at NCSU.

### Teaching and Mentoring

98. Like his Scholarship contributions, Dr. Katti's Teaching and Mentoring activities on his dossier were plentiful and spanned his entire career. Again, the Committee Report countered its positive note of the prolific number of different courses offered over his career with an undercutting comment about "poor" evaluations the first year he taught at NCSU.

99. The report noted also that with this feedback from evaluations, Dr. Katti's scores uniformly rose in all areas. Dr. Katti's references noted his non-traditional

teaching style which required more student leadership than traditional lecture classes as a source of lower evaluations.

100. Positives noted also included volunteering to teach a unit and guest lecturing in two courses and developing and team teaching a new course in the Public Science cluster, as well as his NCSU contributions of advising 2 PhD students and 1 master's student and serving on the committee for four graduate students.

101. Despite all of the evidence that Dr. Katti's efforts in teaching and mentoring not only met but exceeded his SFR, in order to provide some justification for denying Dr. Katti tenure, the report noted that "some cluster members" had a concern that Dr. Katti did not provide a one-third effort as compared to the other two team teachers in 2017, that he only taught two of fifteen weeks, did not provide timely readings and did not grade student work in 2018, and that in 2019 when the lead teacher of this class, it was cancelled due to low enrollment partly due to his "failure to actively recruit students."

102. The only cluster members on the committee were Dr. Goodwin and Dr. Zagacki. It is not clear why Dr. Zagacki was deemed ineligible to vote, except that he might have been considered a department chair, but in that case, it's not clear why a different 12th member of the committee was not appointed if Dr. Zagicki was ineligible to vote.

103. Finally, the report noted that the "committee's primary concern [with regard to teaching and mentoring] was about Dr. Katti not teaching one of the two classes required in his SFR.

104. Again, as with scholarship, it defied credulity that the Committee could justify the denial of tenure based on the fact that Dr. Katti did not teach one course during one semester out of all of his years of teaching, especially given the circumstances under which the class was cancelled. Those circumstances included that Dr. Kattie was advised by both his department head and the Public Science cluster to cancel the class, and that fact that Dr. Gower told him he would assign him an additional class in the fall to make up for the spring cancellation. Further, at the time of the IRPTC review in Fall 2019, Dr. Katti was already teaching three courses (FW 403, NR 595, NR 293), and Dr. Gower was aware of this teaching load.

## Teaching Methods: Non-traditional

105. As Dr. Katti noted in his annual activity summaries in his tenure application when discussing his teaching evaluations, there is significant academic research to support the idea that "a growing body of peer-reviewed literature analyzing student evaluations of teaching finds evidence that faculty of color, and those with non-American accents often get lower scores, as do courses using non-traditional lecture-based teaching approaches."

106. Indeed, Section 8 and 8.1 of REG 05.20.10 – Evaluation of Teaching states:

> 8.0 Because the results of student and peer evaluations of teaching are used in personnel decisions, interpreting evaluation results must be done with caution.

8.1 Evaluation of teaching effectiveness must not be based on any single source of data. It may include peer review, faculty evaluations, teaching portfolios, exit interviews, and alumni surveys.

107.    With regard to Dr. Gower's analysis of Dr. Katti's teaching effort in his annual reviews, his comments on Dr. Katti's teaching effort in 2018 erroneously included information from 2019 in his review. Dr. Gower's comment stated that Dr. Katti did not meet his teaching effort for 2018 due to the cancellation of a Spring 2019 class (which it should be noted he himself had advised Dr. Katti to cancel due to low enrollment).

108.    This inappropriate comment was clearly the basis for the negative tenure review consideration of his teaching effort: "[t]he committee's primary concern was about Dr. Katti not teaching one of the two classes in his SFR."

109.    In both of his 2017 and 2018 annual review summaries, Dr. Gower's remarks about Dr. Katti's class evaluation scores contained inaccurate information. For the calendar year 2017, Dr. Gower noted that Dr. Katti had a class evaluation score for his Spring 2017 class NR 595 (graduate) of 4.72 (with a 66% response rate [6/9 students] and 3.43 (it was actually 3.52) for his Fall 2017 class FW 403 (undergraduate) (with a 50% response rate [7/14 students]. Dr. Gower noted that the FER faculty average was 4.39; in fact, Dr. Katti's average was 4.12, only barely lower.

110.    For calendar year 2018, in addition to his inaccurate statement about not meeting his teaching requirement, Dr. Gower also failed to note that in Dr. Katti's spring class, he received an average evaluation of 4.50, again above the

FER faculty average, and for the class in which he had received a 3.52 the previous fall, his evaluation scores increased to 3.61.

111. Assuming the FER faculty average remained the same (Dr. Gower does not specify it in this review), Dr. Katti still maintained a 4.06 overall average, compared to the 4.39 FER faculty average, making it difficult to understand how such an average rating could put him in the lowest 5% of the FER faculty. Based on his inaccurate assessment of Dr. Katti's teaching load in 2018 and no facts regarding Dr. Katti's mentoring whatsoever, Dr. Gower stated in his summary for his review of Dr. Katti's activities for 2018 that his "Teaching and Mentoring did not meet expectations."

112. Finally, in this review significantly, Dr. Gower stated this: "As a friend and mentor, I honestly think your professional career would benefit from a more structured approach. While you may be [sic] accustom to a more "loose and reactive" style of operation, it is clear that style has caused friction with some of your colleagues and students."

113. This comment evidences a disregard for non-traditional teaching methods that his graduate students clearly preferred (scores of 4.72 and 4.5 in his graduate courses), but which younger, perhaps less academically inclined undergraduates resisted, as requiring more effort.

114. To the extent there was resistance to Dr. Katti's teaching methods, his teaching methods in an academic setting were an assertion of his first amendment rights which NCSU and the academy purport to protect and value. To the extent that

the committee and his department head held those methods against him as well as student evaluations which did not take his non-traditional methods of teaching into account, Dr. Katti's constitutional rights were not protected by either his department head, other colleagues, or the tenure review process itself.

## Service

115. Dr. Katti's tenure application provided ample evidence of his service both on and off campus and in the communities in which he has lived during his academic career, the Committee report made an unsupported statement that Dr. Katti did not "meet expectations for service within his cluster or department." This statement was not only unsupported, but it was also without basis in fact, Dr. Katti's service contributions over his entire career, including those at NCSU, overshadowed any possible quibble with committee's cluster members who might have suggested that he did not provide service to the cluster. And in the end, the Committee report did agree that Dr. Katti's service appointment of 10% was met or exceeded by his overall service activities.

## Peer-reviewed Publications

116. In Dr. Gower's shockingly brief annual reviews, he made comments in both 2017 and 2018 indicating his preference for and valuation of traditional, American metrics of evaluation. He indicated that Dr. Katti should focus more on producing "peer-reviewed manuscripts" as opposed to "non-peer reviewed and conference papers (2017 Summary) and "blogs" (2018 Summary). (Katti Annual Activities and Gower Summary of Annual Meeting 2016-2019). It was also made

implicitly clear to Dr. Katti that more effort towards podcasting would not count as significant according to the metrics to be used for tenure evaluation.

117. In fact, even if one only considered Dr. Katti's peer reviewed publications between 2016 and 2018, Dr. Katti had 3 in 2016, 1 in 2017, 2 in 2018, and 4 in 2019, two of which in 2019 included student contributors, clearly showing an upward trajectory of traditional peer-reviewed publications.

118. With regard to other non-traditional publications, Dr. Katti made comparable contributions:

|  | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Refereed Papers | 3 | 1 | 2 | 4 |
| Non-refereed articles | 2 | 1 | 1 | 1 |
| Conference Papers | 5 | 3 | 5 | 5 |

119. Notably, in Dr. Gower's 2018 annual review, he discounted both of Dr. Katti's refereed publications, erroneously noting that they had been in the previous calendar year. In fact, in 2017, one of the publications that was listed as "in press" in 2017 was actually published in 2018. Thus, Dr. Katti did in fact have two refereed publications in 2018, for an average of two peer-reviewed publications a year between 2016 and 2018.

120. For 2019, Dr. Katti had 4 peer-reviewed publications, two of which had student contributions. And despite Dr. Gower's comments on his "lack" of peer-reviewed papers, the IRPTC committee noted that between 2016 and 2019, Dr. Katti had

published 6 such papers, with 4 in "high impact international journals" and 27 over his entire career.

121. No issue with publications was noted by the IRPTC in its analysis of his scholarship contributions, except for the last sentence which read "[t]he committee held mixed opinions about whether Dr. Katti met expectations for scholarship based on his publication record . . . ." however no factual support was provided for this implied criticism.

122. On the contrary, the IRPTC also made a factual error in noting that Dr. Katti "has published 27 peer reviewed journal articles over his career (since 1991)" when in fact Dr. Katti had listed 38 peer-reviewed publications in the dossier. Even if the IRPTC discounted some, such as peer-reviewed book chapters, Dr. Katti's list included 30 papers published in peer-reviewed journals over his career.

123. This error was carried over into the College RPT Committee's assessment, which erroneously states that "Dr. Katti has 28 peer-reviewed publications since 1991." Further, the CRPTC review noted that "Since his tenure promotion at CSU-Fresno (2010), Dr. Katti has 10 published, peer-review articles, a trajectory that the committee questioned as acceptable for the NC State Chancellor's Faculty Excellence Program."

124. In addition to suddenly introducing the idea that there were different standards and expectations for the NC State Chancellor's Faculty Excellence Program

faculty, the committee once again made a factual error: Dr. Katti had in fact listed 16 peer-reviewed papers in his Dossier that were published after 2010.

## Peer Review of Dr. Katti's Teaching

125.  As the NCSU website provides, "Peer Review: Colleagues (peers) are generally considered the best reviewers for aspects of teaching such as content expertise, pedagogical strategies, and assessment strategies. The literature on peer review is consistent in suggesting that the areas of review listed by Peter Seldin in 1984."

126. A departmental peer review committee conducted the only peer review during Dr. Katti's probationary period, for the FW 403 class in Fall 2017 (the first time he taught this class). The committee noted:

> Overall, we found Madhu as a highly effective teacher who engages his students in thoughtful and relevant discourse related to current real world examples and issues of Urban Wildlife Management. Madhu's teaching style is student-centered and encourages students to take ownership of their learning and understanding.
>
> The attached forms represent three visits to FW 403. Both Jason and Lara observed on the first visit, the second visit was Jason only, and the third visit was Lara only. We met with Madhu prior to completing these evaluations, and we met again at the end of the process to discuss our comments and this summary report.
>
> We noted the following key strengths in Madhu's teaching:
> ·       Class format is constructive and interactive – each student takes responsibility for one chapter of the text. They become the expert and sharpen communication skills by leading the class.
> ·       Madhu's own experiences and expertise supplement that which is provided by the student leader to lend important depth to the topics.
> ·       Topics are relevant and related to current issues or pertinent examples

- Comfort with open discussion
- Outside of lecture, student work collaboratively on several projects.
- All instruction is student-centered.

127. This peer review was part of a "summative evaluation" described this way in Section 2.2 of REG 05.20.10 – Evaluation of Teaching:

> Evaluation for the purpose of making personnel decisions and for enhancing teaching effectiveness is defined as "summative evaluation". Administrators and departmental voting faculty evaluate data from students, peers, and the instructor in order to make informed decisions regarding reappointment, promotion and tenure, for post tenure review of faculty, teaching awards or for consideration of merit pay increases.

128. Clearly, Dr. Katti's peer reviews were not considered by Dr. Gower in his annual reviews nor the IRPTC when concluding that Dr. Katti did not meet expectations for teaching and mentoring.

129. In fact, the IRPTC report actually stated at its conclusion on Teaching and Mentoring that the "committee's primary concern was about Dr. Katti not teaching one of the two classes in his SFR. Given that Dr. Katti met his full teaching load while at CSU-Fresno in 2016 (teaching 3-4 classes every semester) and met his full teaching load in both 2017 and 2018, the IRPTC "dinged" Dr. Katti for not teaching the Spring 2019 course, which had so enraged Dr. Goodwin, even though his annual activity summary clearly indicates that he did teach two classes, FW 403; NR 595 graduate section, and an independent study, NR 293.

130. In sum, there were no valid concerns about his teaching and mentoring in the IRPTC report given that his peer review was excellent, his class evaluation scores were close to those of the FER faculty, he met his full teaching load every semester at NCSU, the cancellation of the spring class was advised by both his department head and his cluster, and despite this cancellation he still taught two classes in calendar year 2019. Dr. Katti's denial of tenure should be reassessed.

131. Subsequent to his receipt of his IRPTC review, Dr. Katti asked Dr. Gower numerous times during a meeting on October 8, 2019, for access to the external reviews submitted on his behalf. However, Dr. Gower never provided them and stated only to Dr. Katti that he could not "stop him from seeing them at some stage."

132. He repeated this request via email on October 21, 2019, but got no response. On October 28, 2019, Dr. Katti finally received confirmation that he was entitled to see his external reviews. On October 16, Dr. Katti met with (then Interim) Dean Dr. Myron Floyd and apprised him of his concerns about the biases and flaws evident in the IRPTC review and Dr. Gower's recommendation.

133. He also shared his apprehension that Dr. Goodwin had played a significant role in tilting the IRPTC review against him and told Dean Floyd about his earlier conversations with Dr. Goodwin as well as with Dr. Gower and Dr. Zagacki where he had expressed concerns about her animosity towards him and asked if she could be removed from the committee.

134. Dr. Katti heard nothing else until December 22, 2019, at which time he was alerted that the College Reappointment, Promotion, and Tenure Committee (CRPTC) recommendations along with the Dean recommendations would be uploaded to the portal that afternoon, which they were not, allegedly due to technical difficulties.

135. On January 2, 2020, the CRPTC and Dean recommendations were finally uploaded to the portal and Dr. Katti was notified, thereby beginning the timeframe for Dr. Katti's response which was submitted on January 9, 2020.

136. On January 7, 2020, and then after no response, again on January 27, 2020, Dr. Katti again requested access to his external reviews, to no avail. Finally, on January 29, 2020, hard paper copies of his external reviews were finally given to Dr. Katti. These reviews offered a comprehensive review of Dr. Katti's academic career at both NCSU and CSU-Fresno, upon which Dr. Katti understood that his tenure review was supposed to be based.

137. On February 25, 2020, the University Reappointment, Promotion, and Tenure Committee (URPTC) review was uploaded and Dr. Katti's time frame for responding started. Dr. Katti uploaded his response on March 2, 2020.

138. Dr. Katti received a very positive annual review on March 30, 2020, with Dr. Gower, Dr. Zagacki, and Dr. Erin Sills (the Assistant Dept Head for FER, becoming Interim Head on July 1, 2020). The meeting was very upbeat with lots of positive feedback and questions about how Dr. Katti's grad students were

progressing, and how his lab's research was impacted by the COVID-19 pandemic.

139. The meeting ended with all three congratulating Dr. Katti on a very productive 2019 and Dr. Gower actually and inexplicably stated that he looked forward to "many more." Nobody mentioned anything about the ongoing tenure review and the fact that Dr. Katti had been told in his denial of tenure letter that his employment would end at the end of the academic year.

140. Dr. Gower subsequently told Dr. Katti that the formal review letter would be forthcoming shortly.

141. Dr. Katti received a final tenure denial decision on April 28, 2020.

142. On May 14, 2020, Dr. Katti received a call from Dr. Nils Peterson, the chair of his department mentor committee and the co-chair of the IRPTC, the committee which had denied Dr. Katti tenure by a 6-5 vote. Dr. Peterson confirmed Dr. Katti's suspicions that Dr. Goodwin was the person on the committee who essentially "torpedoed" his tenure review, by undermining Dr. Katti aggressively during the IRPTC meeting.

143. Dr. Peterson also indicated to Dr. Katti that Dr. Goodwin had "blindsided" him and others on the committee who knew Dr. Katti by making forceful arguments which apparently also swayed other members of the committee from other departments who did not know Dr. Katti by representing herself as the voice of the cluster. Dr. Zagacki who was in her department, and a founder of the Public

Science cluster, did not refute her implication that she spoke for the entire cluster. Dr. Zagacki also did not vote.

144. Her arguments that Dr. Katti was not qualified to be a tenured professor at NCSU apparently persuaded five other committee members into voting against granting Dr. Katti tenure, resulting in a 6:5 split vote against him.

145. Dr. Peterson also told Dr. Katti that that Dr. Goodwin made the process of drafting the committee's recommendation letter very difficult by inserting inappropriate content regarding Dr. Katti which Dr. Peterson repeatedly had to remove, only to have her attempt to add it again. He indicated to Dr. Katti that he was surprised at her persistent and angry attacks on Dr. Katti.

146. Dr. Peterson also indicated that neither he nor the committee had seen Dr. Gower's letter, and they had also not seen Dr. Katti's response to Dr. Gower's letter (both of which Dr. Gower was required to share with the committee per addendum to REG 05.20.05).

147. REG 05.20.05, Additional References: Departmental Heads Guide to NC State's Reappointment, Promotion and Tenure (RPT) Process states:

> Share your written assessment and the written assessment and tally of votes by the DVF with each candidate and let them know they have five business days to submit an optional written response to the review by DVF and you. Simultaneously, share your assessment and recommendation with the DVF. Share any candidate response with the DVF."...
>
> You will assist the Dean in sharing the written assessment and tally of votes by the College Reappointment, Promotion and Tenure Committee and the Dean's assessment with the candidate and DVF. If the

candidate chooses to respond to the college level you will be asked to share it with the DVF.

148. Dr. Peterson indicated surprise at hearing from Dr. Katti that Dr. Gower's letter contained references to incidents which had occurred a year earlier regarding the Doris Duke students, and which had never been discussed by Dr. Gower with Dr. Katti, nor had Dr. Katti ever been given an opportunity to respond to such complaints.

149. Dr. Peterson concluded that all of this amounted to a failure of mentoring by the department, particularly because Dr. Katti's Mentoring Committee, of which he was Chair, had never been informed by Dr. Gower about any concerns regarding Dr. Katti's teaching, mentoring, or research activities, nor were they made aware of the incident involving Dr. Cooper, or the issue with the students in the Doris Duke Scholars program.

150. Upon information and belief, Dr. Leggett told Dr. Gower after the fact that the Doris Duke Scholars program issues should not have been held against Dr. Katti in the tenure review process.

151. The procedures followed to reach the tenure decision materially deviated from prescribed procedures such that doubt is cast on the integrity of the decision not to reappoint and create an inference of discrimination given that the procedures were followed with regard to applicants for tenure that were not of Dr. Katti's race and ethnicity.

152. The pre-tenure process which should have and allegedly did include a "mentoring committee" was a farce in Dr. Katti's case and he was not mentored

in the same manner as other applicants for tenure that were not of Dr. Katti's race and ethnicity.

153. Dr. Gower, who served as Dr. Katti's Department Head from the beginning of his employment in August 2016 through his denial of tenure in April 2020, was keenly aware of the importance of mentoring junior faculty. In fact, he devoted two slides in March of 2019 touting the success of the department mentoring committees in his PowerPoint summary of his five-year tenure as department head:

**NC STATE** Natural Resources — Department of Forestry & Environmental Resources

## Mentor Committees help junior faculty be successful

| Tenure track faculty | Mentor Chair | Mentor #2 | Mentor #3 | RPT |
|---|---|---|---|---|
| Forrester | Abt | Sills | Delborne | R |
| Gray | Meentemeyer | Scheller | King | R |
| Cook | Nichols | McKeand | Goldfarb | R |
| Pacifici | Moorman | Peterson | Whetten | R |
| Martin | Sills | Moorman | Emanuel | R |
| Ardon | King | Shear | Isik | R |
| Leggett | Goldfarb | Hess | Nelson | 2020 R |
| Rivers | Goldfarb | Nelson | Hess | 2020 PT |
| Katti | Peterson | Cubbage | Moorman | 2020 T |
| Wang | Whetten | Isik | Hodge | 2020 R |
| Parajiuli | Bardon | Moorman | Abt | 2020 R |
| Kern | Scheller | Cubbage | King | 2021 R |
| Payn | Hodge | Blank | Whetten | 2021 R |
| Ercumen | Emanuel | Nichols | Isik | 2021 R |
| Tulbure | | | | |

**Mentor Committees help junior faculty be successful**

| Non-Tenure track faculty | Mentor Chair | Mentor #2 | Mentor #3 | RPT |
|---|---|---|---|---|
| Jeffries | Hess | L. Pacifici | Blank | P ✍ |
| Jetton | Isik | Hodge | Whetten | P ✍ |
| Pacifici, L. | Moorman | Litzenberger | Goldfarb | P ✍ |
| Costanza | Moorman | Hess | Forrester | |
| Acosta | Isik | Frampton | Whetten | |
| Nepal | Cubbage | Abt | Megalos | |

A total of 20 mentoring committees for T/TT/NTT faculty....

154. And significantly Dr. Gower's own Department policies on tenure provided the following with regard to mentoring:

> 7. Procedures for RPT Review
> 7.1. Mentoring Committees
> Because the Department Voting Faculty is the body that initially evaluates and makes the recommendations regarding reappointment, promotion, and tenure, it is important that the Department Voting Faculty be kept appraised of the contents of each Statement of Mutual Expectation for faculty members below the rank of full professor. For these consultations, the Department Voting Faculty will be represented by Mentoring Committees consisting of two Professors and one Associate Professor for Assistant Professors and Three Professors for Associate Professors. In each case, at least one member of the Mentoring Committee will be outside of the faculty member's specific sub-discipline. Any new or modified Statement of Mutual Expectation should be brought before the Mentoring Committee at the earliest opportunity. **It is the responsibility of these committees to critique each Statement of Mutual Expectation so submitted and to inform the department head if the committee sees a danger that a given Statement of Mutual Expectation places too little time, emphasis, or accountability on the types of scholarly achievement that will be required for the Department Voting Faculty to justify a positive recommendation regarding promotion and/or tenure.**

155. Nevertheless, despite the acknowledged criticality of mentoring committees to successful tenure outcomes, Dr. Gower waited until the end of Dr. Katti's second academic year at NCSU to connect Dr. Katti with a mentoring committee, giving him only one academic year to benefit from a mentoring committee before the required submission of his tenure dossier.

156. Dr. Katti's first of two meetings with a member of his mentoring committee occurred on June 7, 2018, and the last occurred on October 18, 2018. This delay occurred despite the fact that Dr. Gower actually identified members of the mentoring committee in 2016.

157. In the publication "Retaining Diverse Department Faculties: A Guide for Department Heads" by the NCSU Office for Institutional Equity and Diversity (OIED), these factors are listed as practices that departments at NCSU were using to retain underrepresented faculty members:

· The department head provides meaningful feedback annually as well as frequent informal feedback throughout the year.

· Senior faculty provide periodic feedback in addition to that given at reappointment. Frequent informal feedback is also provided regularly by mentors or coaches and occasionally by other senior faculty.

· All new faculty are routinely provided with structured mentoring. It may take the form of a single mentor for the first year, a teaching mentor and a research mentor, or a mentor coach who works with the faculty member throughout the pre-tenure period.

· The department head and mentor help keep faculty from underrepresented groups from being overburdened with service responsibilities.

· Associate professors are routinely provided guidance by the department head and senior colleagues as they progress toward promotion. Attention is paid to

leadership development, goal clarification and facilitation of award nominations and other forms of recognition.

• Work/life events (e.g., welcoming a new baby, elder care and medical problems) are addressed by university policies, which are frequently inadequate to cover faculty members' needs.

• Department heads make explicit commitments to flexibility in accommodating work/life events, such as by adjusting teaching schedules, allowing work from home and limiting early morning or late afternoon faculty meetings.

• Maintaining a positive climate is an explicit part of the department's mission and is addressed by a standing task force or committee.

• The department head pays attention to climate by maintaining transparency in decision making, keeping strong lines of communication open with faculty and staff and helping to resolve conflicts as soon as they develop.

158. Clearly, Dr. Katti did not receive the benefit of many of these "best practices" for retaining underrepresented faculty, especially the practice that "[a]ll new faculty are routinely provided with structured mentoring. It may take the form of a single mentor for the first year, a teaching mentor and a research mentor, or a mentor coach who works with the faculty member throughout the pre-tenure period."

159. Finally, as noted in the URPTC Annual Report Summary for 2015-2016 (for the year immediately prior to Dr. Katti's arrival at NCSU), **"[t]he outcome of the RPT process** at the department and college levels appears to be directly related to the **skills and experiences of the department head to mentor faculty** and guide the development of the SME and the skills and experiences of the DVF in using the SME as context for evaluation."  2015-2016 URPTC Annual Report Summary of the Review Process, Identified Issues and Recommendations, p3.

160. Given that the primary duty of the mentoring committee under departmental policy was "to inform the department head if the committee sees a danger that a given Statement of Mutual Expectation places too little time, emphasis, or accountability on the types of scholarly achievement that will be required for the Department Voting Faculty to justify a positive recommendation regarding promotion and/or tenure," the failure of Dr. Gower to provide Dr. Katti with a mentoring committee can be said to be directly related to the lack of a "positive recommendation" for Dr. Katti.

161. Given the admitted importance of the mentoring committee to successful tenure outcomes, the fact that Dr. Katti was deprived of this resource was a clear departure from the policies and procedures in place to such an extent as to raise an inference of discrimination because other applicants for tenure that were not of Dr. Katti's race and ethnicity did receive the benefit of adherence to the policies and procedures.

162. The URPTC Summary is also important because it notes that the "skills and experience of the department head to mentor faculty" is an important factor in the "outcome of the RPT process." This lack of mentoring on Dr. Gower's part was nowhere more evident than in his complete failure to provide Dr. Katti with meaningful feedback during his annual review meetings.

163. Not only did he avoid raising issues that he would later or personally find to be significant during the annual review meetings with Dr. Katti, but Dr. Gower also duplicitously and months after the actual meetings occurred created

documents which included references to matters not discussed at the meetings and sometimes which had not even occurred at the time of the meetings (e.g., Doris Duke Scholar students transfer to another project).

164. A comparison of the contents of Dr. Katti's own list of annual activity report compared to Dr. Gower's own written summary of the review and recitation of the topics discussed (which sometimes were not) at the annual review leads to the unmistakable conclusion that, unlike recommended for retaining diverse faculty, Dr. Gower, as the department head, did not "provides meaningful feedback annually as well as frequent informal feedback throughout the year."

165. Under NCSU REG 05.20.03 2.5, the department head is obligated to provide a "written summary of the review" and "indicate that a review of the COI and NOI disclosures and conflict management plans . . . . [were] completed."

166. Dr. Gower's written summaries of the reviews he conducted with Dr. Katti were sparse and provided no indication that he or any other senior faculty provided "periodic feedback in addition to that given at reappointment." Along with this lack of "[f]requent informal feedback . . . provided regularly by mentors or coaches and occasionally by other senior faculty," these failures to provide feedback contributed to Dr. Katti being blind-sided by the denial of tenure.

167. None of Dr. Gower's reviews or any other documentation show that Dr. Katti as an associate professor was "routinely provided guidance by the department head and senior colleagues as [he] progress[ed] toward promotion." Nor do Dr. Gower's annual reviews show that any "[a]ttention [was] paid to leadership

development, goal clarification and facilitation of award nominations and other forms of recognition" that would enhance Dr. Katti's opportunity for a success RPT experience.

168. Even if not required, the provision of any of these recommended practices and policies of providing regular formal and informal feedback and guidance and counseling by mentors and coaches should have been offered to Dr. Katti, but were not, while they were offered to applicants for tenure that were not of Dr. Katti's race and ethnicity.

169. The lack of provision of these practices and the complete absence of meaningful annual reviews for Dr. Katti is clear evidence that the procedures followed by Dr. Gower as department head in Dr. Katti's first two academic years at NCSU, and upon which the IRPT Committee clearly focused, violated the policies and procedures to such an extent that an inference of discrimination is raised given that applicants for tenure that were not of Dr. Katti's race and ethnicity benefits from the very practices Dr. Katti was denied.

170. Even if the blatant violation of policies pre-tenure evaluation which were designed to ensure a fair opportunity for tenure evaluation and which were not followed in Dr. Katti's case were not a sufficient reason to reassess his tenure application, certainly Dr. Goodwin's failure to recuse herself and the failure of Dr. Gower and Dr. Zagacki to address her personal animosity and inability to be an objective member of the IRPTC are themselves sufficient violations of policy that cast serious doubt on the fairness of the tenure review.

171. Dr. Goodwin's animosity seemed to arise from her stereotypical view of men of Dr. Katti's race and ethnicity as chauvinistic and disdainful of women. The enabling of Dr. Goodwin by Dr. Gower and Dr. Zagacki can only be explained by an unwillingness to resist her discriminatory behavior and thus their actions ratified her racial and gender animus towards Dr. Katti.

172. The failure of Dr. Gower and Dr. Zagacki to follow the policies and procedures in place to assist Dr. Katti in his tenure application efforts also appears to have arisen from a dislike of him, as compared to other similarly situated faculty members applying for tenure who were not of Dr. Katti's race and ethnicity, and who were provided the support that Dr. Katti did not receive.

173. REG 05.25.05 Consultation and Written Assessments, Recommendations and Responses in RPT Review section 1.7 applicable to joint/interdisciplinary appointments provides that the Dean may create "an interdisciplinary review committee" and members "shall be appointed in consultation with the candidate, the Head of the home department, and other faculty familiar with the faculty member's interdisciplinary area and approved by the Provost."

174. The regulation also provides that "[f]or the purposes of this regulation, interdisciplinary review committees will function in the same ways as the DVF. Members of interdisciplinary review committees will constitute the eligible voting faculty for the cases they are appointed to review."

175. Section 1.5 provides that

DVF or CRPTC members have the responsibility to recuse themselves from voting if there is an actual **or appearance of** a personal or

professional conflict of interest. For example, if a DVF or CRPTC member has been the subject of a formal grievance **or other less formal complaint by the candidate or vice versa** that would create **the appearance of** a conflict of interest, the DVF or CRPTC member **must** recuse himself or herself. The DVF or CRPTC member must inform the Department Head of the recusal but is not required to explain the basis of the recusal. (emphasis added).

176. Clearly, under these policies, Dr. Goodwin should have recused herself given that she indicated clearly in March to Dr. Katti himself that she was not interested in any resolution of the conflict she had with him, that he was not and would never be a trusted colleague in the Public Science cluster, that she viewed him as a constant disappointment and incapable of producing anything and that he was incompetent.

177. Dr. Zagacki confirmed to Dr. Katti that Dr. Goodwin had "passed along her concerns to me" before the annual review meeting with Dr. Gower in March 2019.

178. Dr. Gower's admission during that meeting to both Dr. Katti and Dr. Zagacki that Dr. Goodwin had "yelled" at Dr. Gower when she learned that Dr. Katti had been "allowed" to cancel the spring course with low enrollment (upon the advice of both Dr. Gower and the members of the Public Science cluster in a long email thread) put Dr. Gower as department head and Dr. Zagacki as a member of the IRPTC on notice of this conflict, her personal animus towards him, and the irreparable bias against him and his application for tenure which would surely make her unsuitable to participate in the review process.

179. Despite knowing of the conflict and knowing of Dr. Katti's concern about the animosity of Dr. Goodwin, they advised him only to address the cancellation of the class in his dossier and not to worry about one or two negative votes which might result from Dr. Goodwin's tainting of the deliberations.

180. In fact, they went so far as to tell him that changing the composition of the review committee at that point would "look bad." Both their reassurance that Dr. Goodwin's animosity would not derail his tenure approval and also telling him that it would negatively affect his tenure review to have her removed dissuaded Dr. Katti from taking further steps.

181. And finally, as if these actions were not themselves bad enough, they took no action to prevent Dr. Goodwin from essentially "torpedoing" Dr. Katti's ability to get a fair review by the members of the IRPTC.

182. Dr. Goodwin's remarks, as made by a full Professor with that purported authority, and also with her presumed knowledge as member of the Public Science cluster about his abilities and his time at NCSU, were clearly sufficient to sway not only one or two, but five other committee members to vote against granting Dr. Katti tenure.

183. Dr. Zagacki clearly, as a member of the committee, and as a founder of the Public Science cluster, was aware of what Dr. Peterson described as her persistent and angry attacks on Dr. Katti.

184. The failure of Dr. Goodwin to recuse herself and the fact that neither Dr. Gower nor Dr. Zagacki took any action to notify the Provost about the obvious conflict

of interest or, diffuse them in any manner during the committee's deliberations provides clear evidence that the tenure process with regard to Dr. Katti was tainted by impermissible discrimination and bias towards him which can be inferred to result from his race and ethnicity given that other similarly situated faculty members were treated much more favorable during the pre-tenure and tenure-review process.

185. The circumstances surrounding Dr. Katti's hiring also are evidence of Dr. Katti's being treated less favorably than other similarly situated faculty members not of his race and ethnicity.

186.  Dr. Katti was told that department and college policy prohibited his being hired as a tenured faculty member when that was not true, as he learned after he was hired. Thus, the mere fact that he was required to apply for tenure is itself evidence of discrimination which taints his tenure review process.

187. In fact, not only did policies in effect at the time allow appointments with tenure, under POL 05.20.01, Section 4.3, but at least one individual was actually hired as tenured faculty within the same department almost immediately after Dr. Katti was told that being hired with tenure was not permitted.

188. Two other faculty members (including Dr. Katti's Public Science Cluster colleague Dr. Cooper) were appointed with tenure during 2018 and 2019. Further, at least one faculty member of the Global Environmental Change and Human Wellbeing cluster, Dr. Scott Mills, had been hired with tenure by the

same department in 2013. Dr. Mills left NC State in 2016. These faculty members are not of Dr. Katti's race or ethnicity.

189. The relevant policy (Section 4.3) states:

> 4.3.1 An Associate Professor coming to that rank from outside the university may either be appointed with tenure or for one (1) probationary appointment not to exceed five (5) years. In cases where the appointment occurs prior to or subsequent to the start of the normal academic or fiscal year, the initial probationary term must be adjusted to coincide with the appropriate reappointment, promotion and tenure cycle, but shall not result in an initial term of fewer than three (3) years and six (6) months or greater than five (5) years, with an end date of May 15 or June 30.

190. In fact, as the table below shows, Dr. Katti has been treated quite differently from others similarly situated to him:

| Name | Hire Date | Race | Nat'l Origin | Sex | Age | Hire Status | Current Status |
|------|-----------|------|--------------|-----|-----|-------------|----------------|
| Madhu Katti | 08/2016 | S. Asian Indian | India | M | 51 | Untenured Associate | T ↓ |
| Caren Cooper | 08/2016 | White | US | F | Est 50 | In 2018, full-time tenured assoc prof (at FT hire) | T↑ |
| Mariela Tulbure | 08/2019 | White | Uncertain | F | Est > 40 | Tenured Associate (at hire) | T↑ |
| Jason Delborne | 08/2013 | White | USA | M | Est > 40 | Untenured Associate | T↑ |
| Scott Mills | 07/2013 | White | USA | M | Est > 50 | Tenured Full Prof (2013) | T↑ |
| Rob Scheller | 08/2017 | White | USA | M | Est > 40 | Tenured Full Prof (2017) | T↑ |

191. Three individuals, Dr. Cooper, Dr. Tulbure, and Dr. Scheller were hired as tenured professors when they came to full-time employment with NCSU in the Department after Dr. Katti was hired. Dr. Mills had been hired as a tenured professor in 2013. Pol 05.20.01 has not changed since Dr. Katti's hire at NCSU. Notably, none of these four were individuals of Dr. Katti's race or ethnicity. Dr. Cooper was hired as a non-tenured part-time associate professor in 2016, the same year as Dr. Katti.

192. In addition, Dr. Scheller had attained tenure and promotion to Associate Professor at his previous institution only in 2014, yet he was offered a tenured Full Professor rank in the department after interviewing just a few months after Dr. Katti joined the department.

193. In contrast, Dr. Katti had attained tenure at CSU-Fresno in 2010 and was up for promotion to Full Professor when he left for NC State. Dr. Gower was well aware of this when he negotiated Dr. Katti's employment offer in 2016 but told him that even a tenured Associate Professor appointment was against department culture.

194. More significantly, the tenure dossier of Dr. Delborne provides additional evidence of the much higher standard that Dr. Katti was held to in his tenure review. Dr. Delborne's background and experience were very similar to Dr. Katti's in that they both transitioned from universities where they had much higher required teaching loads, and which were not major research (R01) universities, such as NCSU. They both transitioned from a department to part

of a group establishing an interdisciplinary research program as part of a new cluster.

195. At the time he was granted tenure, Dr. Delborne listed the following under "Scholarly and creative activities" in his dossier compared to Dr. Katti:

| At time of tenure application | Delborne | Katti |
|---|---|---|
| Peer reviewed publications/book chapters | 11/7 | 30/6 |
| Peer reviewed publications/book chapters at NCSU | 4 | 6 |
| Extramural grants at previous university | 5 | 6 |
| Extramural grants at NCSU | 0 | 1 |
| Peer-reviewed datasets / case studies | 0 | 2/1 |
| Edited Book | 1 | 1 |
| Invited Public Lecture/Research Presentation | 0/23 | 14/34 |
| Symposium / Conference Presentations | 23 | 99 |
| Popular writing (internet blogs, magazines, newspapers) | 4 | 49 |

196. It cannot be ignored when considering whether Dr. Katti was the victim of impermissible discrimination that Dr. Goodwin (white female) was on his tenure committee and according to at least two witnesses vociferously opposed his application due to her pre-existing and inexplicable animosity towards him.

197. Her remarks to him holding him in such disdain and deeming him incompetent in the face of obtaining extramural funding and other accomplishments seems to have no source other than her dislike of Dr. Katti for reasons he could not change: his race and ethnicity.

198. Dr. Gower's comment about his "loose and reactive" teaching style also typifies the negative perception of stereotypes too often used by majority White faculty members against minority faculty of color and immigrants.

199. As Dr. Katti described in his invited talk on "Respecting Culture in STEM Research" during the "Diversity in STEM Symposium: Creating Inclusive Spaces" held at NC State on February 5, 2020, he has faced this kind of stereotype threat throughout his academic career as an immigrant scholar in the US, starting with his Ph.D. advisor who told him that "your Indian cultural baggage is holding you back from being a good scientist".

200. He also recounted the prejudice and hostility he experienced as an immigrant scholar of color early in his career during an invited panel presentation on "Brainstorming How to Reintegrate Targets Into Research and Academic Spaces" during the 2019 Public Summit of the Action Collaborative on Preventing Sexual Harassment in Higher Education, held by The National Academies of Sciences, Engineering, and Medicine, in Seattle, WA, November, 19-20, 2019.

201. As described in the above facts, Dr. Jean Goodwin "was gunning" for Dr. Katti and she made this clear to Dr. Zagacki and Dr. Gower, who relayed it to others, and Dr. Peterson, and even Dr. Cooper who sought to have her recuse herself from Dr. Katti's tenure review committee.

202. This evidence alone shows that Dr. Goodwin's participation in the tenure review decision tainted the entire process due to her "personal malice," "dislike,

animosity, ill-will" and "hatred" which were clearly based on Dr. Katti's personal characteristics, traits or circumstances (i.e., his race and ethnicity) which should have been irrelevant to a valid university decision on whether Dr. Katti's record supported an award of tenure.

203. The Citizen Science Association's biannual conference was hosted by NC State and the Public Science Cluster in Raleigh on March 13-17, 2019. The cluster's twitter account (@PublicSci_NCSU) which was controlled by Dr. Goodwin was active throughout this conference highlighting the work of the cluster, except that of Dr. Katti and his lab.

204. In a series of tweets inviting attendees to presentations by various cluster faculty and students, Dr. Goodwin pointedly left out the two presentations from Dr. Katti and his lab.

205. During academic year (2019-2020), Dr. Katti continued to participate in regular Public Science Cluster meetings and events, during which Dr. Goodwin consistently treated him as persona non grata, ignoring his input and making Dr. Katti feel essentially invisible in the Cluster.

206. Further, anything shared by Dr. Katti on the Public Science listserv or Slack channel was routinely ignored by Dr. Goodwin.

207. NCSU's own policies provide:

> Within the University, **important faculty personnel decisions** are based on evaluations of performance rendered by a candidate's colleagues and supervisors, who are in the best position to make such judgments. These assessments are not the product of mechanically applied checklists, criteria, or formulas; there is no simple litmus test for outstanding job performance.

Rather, these decisions must reflect **careful exercises of discretion**, in which the faculty colleagues draw on their own academic knowledge, experience, and perceptions to evaluate the candidate's qualifications and performance. The academic review process seeks to obtain the **collective good faith professional academic judgment** of the candidate's colleagues and administrators as the basis for personnel decisions. These decisions are entitled to great deference and weight, and, as such, **must be based on considerations that are relevant to the candidate's performance and potential to contribute to the good of the institution.**

NCSU POL 05.25.01 Section 3 Reviews of Non-Reappointment Decisions (Section 604).

208. While the policy provides that "[i]mportant faculty personnel decisions are based on evaluations of performance" which must "reflect careful exercise of discretion" during an "academic review process [which] seeks to obtain the collective good faith professional academic judgment . . . [and] must be based on considerations that are relevant to the candidate's performance and potential to contribute to the good of the institution," Dr. Katti did not get either the requisite "careful exercise of discretion" or "good faith" and "professional judgment" at least from one or more participants in the process.

209. Those individuals intentionally presented and pressed considerations which were decidedly **not relevant** to Dr. Katti's overall performance based on his career of accomplishments. Nor did these irrelevant considerations raised by these individuals fairly consider Dr. Katti's past contributions or his potential for future contributions to NCSU.

210.

# COUNT I

## 42 U.S.C.A. § 1983: Discrimination Based on Race/Ethnicity

1. The allegations of paragraphs 1 to 202 are incorporated here by reference.

2. Dr. Katti was a member of a protected class.

3. Dr. Katti suffered an adverse employment action in the form of denial of tenure.

4. Dr. Katti was qualified to be awarded tenure and but for his race and ethnicity he would have been awarded tenure in 2020.

5. Defendants Goodwin, Gower, Zagacki, Arden, and Floyd acted under color of state law in depriving Dr. Katti of his right to be free from discrimination based on his race and ethnicity when they acted to deny him tenure in 2020.

6. In violating Dr. Katti's rights as described above, Defendants violated Dr. Katti's rights under 42 U.S.C.A. § 1983.

7. As a direct and proximate result of the violation of Dr. Katti's rights under 42 U.S.C.A. § 1983, Dr. Katti has suffered damages in the form of loss of wages and all associated benefits from April 28, 2020, to the present (plus interest), emotional distress, mental anguish and humiliation plus attorney's fees and expenses.

# COUNT II

## 42 U.S.C.A. § 1983: Denial of Rights and Benefits Based on Race

1. The allegations of paragraphs 1 to 202 are incorporated here by reference.

2. Dr. Katti is Indian, being from the country of India, and is considered a member of the Asian race by the census.

3. Dr. Katti suffered an adverse employment action in the form of denial of tenure which was a denial of his right "to make and enforce contracts" and have "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

4. Dr. Katti was qualified to be awarded tenure and but for his race and ethnicity he would have been tenured in 2020.

5. Defendants NCSU, Goodwin, Gower, Zagacki, Arden, and Floyd acted to deprive Dr. Katti of his right to "to make and enforce contracts" and have "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" when they acted to deny him tenure in 2020.

6. In violating Dr. Katti's rights as described above, Defendants violated Dr. Katti's rights under 42 U.S.C.A. § 1981.

7. As a direct and proximate result of the violation of Dr. Katti's rights under 42 U.S.C.A. § 1981, Dr. Katti has suffered damages in the form of loss of wages and all associated benefits from April 28, 2020, to the present (plus interest), emotional distress, mental anguish and humiliation plus attorney's fees and expenses.

**Plaintiff demands a trial by jury on all counts.**

THEREFORE, plaintiff demands judgment against defendant as follows:

1. Back pay from April 28, 2020, to the present, including retroactive application of all benefits, raises and promotions to which Plaintiff would have been entitled;

2. Compensatory damages in the amount to be proven at trial;

3. Attorney's fees;

4. A declaration that defendants' conduct was unlawful; and

5. Such other and further relief as the Court may order.

Respectfully submitted, this 28th day of April 2023.

/S/ VALERIE L. BATEMAN
Valerie L. Bateman
NC State Bar: 13417
NEW SOUTH LAW FIRM
209 Lloyd St., Ste 350
Carrboro, NC 27510
T: 919-810-3139
F: 919-823-6383
valerie@newsouthlawfirm.com
***Attorneys for Plaintiff***

/S/ JUNE K. ALLISON
June K. Allison
NC State Bar: 9673
NEW SOUTH LAW FIRM
233 S. Laurel Avenue
Charlotte, NC 28207
T: 704-277-0113
F: 919-823-6383
june@newsouthlawfirm.com
***Attorneys for Plaintiff***

## VERIFICATION OF MADHUSUDAN KATTI

MADHUSUDAN KATTI being duly sworn, deposes and says:

That the contents of the foregoing **COMPLAINT** about which he has knowledge are true to his own knowledge, except as to matters stated on information and belief, and as to those matters, he believes them to be true.

_Madhusodu_
MADHUSUDAN KATTI

_WAKE_ County

Subscribed and sworn to before me this day

by MADHUSUDAN KATTI

on the _28th_ day of _April_ 2023.

_Caitlin Bossert_
NOTARY PUBLIC

_Caitlin Bossert_
NOTARY PUBLIC

Caitlin Bossert Emelio
Printed name of Notary

My Commission Expires:

Aug. 14th 2023

Caitlin Bossert Emelio
NOTARY
My commission
expires
8/14/2023
PUBLIC
Wake County, NC